Blue Mountain Telephone & Telegraph Company, Appellant, v. Pennsylvania Public Utility Commission.

,Argued April 20, 1949. Before RHODES, P. J., HIRT, RENO, DITHRICH, ARNOLD and FINE, JJ. (ROSS, J., absent).

Proceeding before Pennsylvania Public Utility Commission upon application of utility for increased rates.

*Arthur E. Nelson* and *James E. Gallagher, Jr.*, with them *James L. Nelson, Stradley, Ronon, Stevens & Young* and *Frank H. Madden,* for appellant.

*Charles E. Thomas,* Counsel, with him *Lloyd S. Benjamin,* Assistant Counsel, for appellee.

OPINION BY ARNOLD, J., August 2, 1949:

The Blue Mountain Telephone & Telegraph Company filed with the Public Utility Commission a proposed tariff for increased rates, which was suspended by the Commission for six months. Three hearings were then held and every opportunity was given the Telephone Company to meet its burden of proof that the proposed rates were just and reasonable. It appeals from the final order of the Commission requiring it to withdraw the proposed tariff and in lieu thereof to file a tariff designed to produce $202,900 annually, an increase in revenue of $24,177. The proposed tariff was designed to produce additional revenue of $51,215,—an increase of approximately 30% of its annual revenue for local and general exchange service to its customers.

The figures given hereafter are approximate. The Commission fixed the fair value and worth for rate-making purposes at $325,000. It refused to allow as a separate item $50,000 alleged by the appellant to be going-concern value,—which will be later discussed. Likewise it refused to apply spot prices in determining the value of the property, and followed the ten-year-average price rule. On depreciated original cost the total value was $309,100, and upon depreciated reproduction cost at ten-year-average prices, $330,300. Both of the foregoing amounts included an allowance for material and supplies and cash working capital, but at a figure less than claimed by the Telephone Company.

I. ACCRUED DEPRECIATION. Appellant complains that the Commission did not properly ascertain the amount of accrued depreciation. The Telephone Company's evidence proceeded on the theory of observed depreciation indicating a depreciation of 27.9%. The Commission was dissatisfied with this opinion evidence and requested that the Telephone Company furnish it with the information necessary to determine accrued depreciation by the age-life method. This the Telephone Company refused to do. Appellant claims that the Commission "rejected" the evidence of observed depreciation, not because of any inherent weakness, but because it conflicted with the depreciation reserve set up by the corporation. This statement is incorrect.

As pointed out in the excellent brief of counsel for the Commission: The appellant's evidence consisted of the presentation of an inventory of its property, coupled with a statement that a detailed inspection was made of the various parts of its property. Thus, with respect to poles, the amount of butt rot, the treatment and the age at which treatment was applied, the over-all condition of the poles and other factors, were the subject of opinion testimony. From this physical aspect of the poles and all of this data, appellant compiled percentages which were said to reflect the average condition of the pole line plant. Appellant's witness then testified that, "similarly," percentages were determined for all other classes of property, and in this manner was derived the percentage figure of depreciation. In regard to the elements of the plant which are retired from service *solely for physical reasons*, a proper observation would be an approximate measure of the actual depreciation. But observation of the physical conditions of the various types of property cannot be the only measure of accrued depreciation. For instance, its buildings would have to be kept in excellent physical condition to permit their being used by their operators and

to house the equipment. They had to be kept physically safe until a very short time before the retirement from service. The same thing is true as to the central office equipment, which on the very day of retirement must be capable of complete operation and of rendering complete telephone service. At the moment of retirement the theoretical accrued depreciation of such buildings and equipment is 100%, and the value thereof thus depreciated is zero, although the condition percentage may be very high. Therefore, physical condition alone is not a sound measure of accrued depreciation in the central office equipment and in the buildings housing it. A proper "depreciation study" to measure the actual depreciation must take into consideration the loss in value to the extent that physical deterioration actually occurs, together with obsolescence, inadequacy and any requirements of public authority. Such a study must contemplate the complete loss of the remaining value or condition value at the time of the retirement. Appellant did not attempt such a study.

It is also a misnomer to classify appellant's testimony as "observed depreciation." For instance, it estimated a service life of 50 years for its right of way and thus reached an annual 2% depreciation for this account, yet the condition of the right of way at the end of the 50 years is actually 100%. Appellant's witnesses sought to explain this by stating that there was no physical depreciation (which is the very thing which was to be determined), but there was a likelihood of abandonment of the rights of way. In this particular item appellant's claim of 2% annual depreciation is without foundation. Allowances for annual depreciation must be reasonably consistent with allowances for accrued depreciation: *Solar Electric Company v. Pennsylvania Public Utility Commission et al.*, 137 Pa. Superior Ct. 325, 9 A. 2d 447. The Commission gave to the testimony only the weight it deserved. The opinion of

the Commission distinctly shows that it carefully considered *all* of the evidence. It pointed out that "station installments" and "drop and block wires" are non-depreciable accounts as defined by the Uniform System of Accounts.[1] In spite of this, appellant assigned a percentage condition to each of these accounts, when they should be retained as non-depreciated throughout their service life, because upon retirement of any element in either account, the cost of the plant part retired is credited to the plant account and charged directly into the operating expense for the year in which retirement is made. Likewise the retirement of the Pen Argyl exchange equipment was determined and anticipated to occur within four months, and the appellant's opinion evidence showed percentage condition of this equipment to be 70%, thus claiming an accrued depreciation of but 30%. It is obvious that appellant's witness gave no serious consideration to either obsolescence or inadequacy, for actually the accrued depreciation in that particular equipment, under the circumstances of imminent retirement, was close to 100%. Appellant planned to retire the switchboard at Bangor within six months. Likewise in the face of this imminent retirement the appellant assigns 50% condition to the equipment. Quite

---

[1] The Commission in its order turned to the Uniform System of Accounts applicable to telephone utilities in Pennsylvania wherein depreciation as applied to depreciable telephone plant ". . . means the loss in service value not restored by current maintenance, incurred in connection with the consumption or prospective retirement of the telephone plant in the course of service from causes which are known to be in current operation, against which the company is not protected by insurance, and the effect of which can be forecast with a reasonable approach to accuracy. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities." The Commission stated in its order that the term "service value" used in that definition means the difference between the original cost and (a) the salvage value for station apparatus, (b) the net salvage value for other telephone plant.

properly the Commission concluded that the opinion of appellant's witness was unsound.

Without multiplying instances, it is apparent that the Commission did consider all the evidence but found a multitude of inherent weaknesses and errors in the claimed "observed depreciation." The Commission is the trier of the facts. Of all forms of evidence, opinion evidence is the weakest and least reliable. Even though uncontradicted it need not be accepted. In this case there was no capricious disregard of evidence. "Capricious disbelief is not merely disbelieving a witness. To constitute capricious disbelief there must be a wilful, deliberate disbelief of an apparently trustworthy witness, whose testimony one of ordinary intelligence could not possibly challenge or entertain the slightest doubt as to its truth. To charge . . . capricious disbelief, it must be so flagrant as to be repugnant to a man of reasonable intelligence.": *Pusey's Estate*, 321 Pa. 248, 262, 184 A. 844. The Commission was well within its rights in not placing the seal of authenticity upon this opinion evidence, and this is especially true in the light of the Telephone Company's refusal to furnish age-life estimates.

The only other evidence of the accrued depreciation was the reserve set up on appellant's books, which was accumulated by the application of percentage to the book cost of the plant, and which was based on the average life of the several elements thereof. The Commission pointed out that the opinion evidence showed the so-called "observed depreciation" to be 27.9%, and that the book reserve for depreciation was 42.5%. The Commission, after carefully considering all of the evidence, found that the accrued depreciation was 38%,— which obviously had to be a judgment figure. Cf. *The Peoples Natural Gas Company v. The Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 475, 491, 34 A. 2d 375. When the Telephone Company set

up a book reserve for depreciation it was advantageous to it to make the percentages for depreciation as high as possible, and thus to justify the then existing rates and the then fair return to the utility. The accrued depreciation set up amounted to 42.5%. Likewise it was to the benefit of the Telephone Company, on the application for increased rates, to place the percentage depreciation as low as possible, thus increasing the value of the property so that the owner might obtain a greater return.

II. REPRODUCTION COST BASED ON TEN-YEAR-AVERAGE PRICES.

The appellant asks us to reverse the Commission for resorting to the ten-year-average prices, rather than spot prices, as a standard for reproduction cost. Appellant's contention is based upon a statement of appellant's witness, Lowe, *that in his opinion* the cost levels will never again be experienced because of price fixing and freezing under O. P. A. orders. It further argues that the ten-year-average prices contain a heavy weighting of pre-war prices on wages and materials. But the Commission was not bound to accept either the witness' opinion or his prophecy. The economic theory to be adopted, and the judgment concerning future prices, rest solely with the Commission. We upheld the ten-year-average price theory in *Equitable Gas Company v. Pennsylvania Public Utility Commission*, 160 Pa. Superior Ct. 458, 466, 51 A. 2d 497. The matter involved in appellant's complaint concerns speculation as to the future, and the right of speculation is with the Commission and not with us.

III. CASH WORKING CAPITAL AND SUPPLIES.

*Without any segregation of the items* the Telephone Company claimed $35,000 for material and supplies and cash working capital. The Commission allowed $13,000 for material and supplies and $8,000 for work-

ing capital, basing its finding, in part, upon the fact that the account on appellant's books for materials and supplies as of February 29, 1948, showed a balance of $13,200; on May 31, 1948, a balance of $11,900; and on July 31, 1948, $9,600. The Commission chose substantially the highest figure and cannot be reversed on the mere opinion of the utility's expert. The only support for a claim of cash working capital of $17,300 was that this represented six weeks' operating expense. But the Commission points out that appellant bills its customers in advance for local service; that during the six weeks period the Company receives $11,000 in cash; and that by making an allowance of $8,000 working capital the Telephone Company had $19,000, which was amply sufficient to meet cash operating needs.

## IV. GOING CONCERN VALUE.

The Commission valued the business of the appellant as a whole, taking into consideration that it is a going concern and as well the financial history of the business. The appellant has not sustained the burden of establishing special value in the organization of its employes which would require the Commission to find a *special* allowance for going concern value. Cf. *Solar Electric Company v. Pennsylvania Public Utility Commission et al.,* supra. The appellant must show that the going concern value ascribed had neither been adequately covered in the rate base nor recouped in the prior earnings. It failed to make such showing, and we cannot convict the Commission of error.

## V. ALLOWABLE REVENUE AND FAIR RATE OF RETURN.

Appellant contended that it should receive an *increase* of $51,200 over the revenues for the year ending July 31, 1948, which were $178,700, thus achieving a total revenue of $229,900. The Commission found that appellant was entitled to an allowable revenue of $202,-900, which was an increase of $24,177 over the existing

revenue. Of this allowable revenue of $202,900, $19,500 is a 6% return to the owners. Appellant vigorously contends that it is entitled to a 7.25% return, on the opinion evidence of the appellant. Under the circumstances here existing no fault can be found with the Commission for fixing the rate of return at 6%.

On July 31, 1948, appellant's capitalization,—capital stock, loans and surplus,—was $260,950. The opinion evidence of appellant's witness assumed that 50% of appellant's capital should be debt capital, and that its cost should be 3.75% annually; and that the balance of common stock capital should cost 11% annually. Upon these hypotheses the witness expressed the opinion that the annual cost of capital should be 7.38%, and so concluded that 7.25% was a fair rate of return. If one-half of appellant's capital, $130,000, is assumed to be debt capital, under appellant's theory the interest requirements at 3.75% amount to only $4,875 per annum. In finding an allowable return of $19,500 there is given a return of 7.47% annually on appellant's capitalization of $260,900,—which is even higher than the rate of 7.25% contended for by appellant's witness. Furthermore, the Commission pointed out that if 50% of appellant's capitalization were debt capital, at an annual interest rate of 3.75%, there would be, under the Commission's finding, a return of 11.19% on the remaining 50% of capitalization constituting the common stock equity. However, appellant's witness contended that it was entitled to an annual return of not less than $40,745, and that such amount was reasonable and fair regardless of what the fair value of the plant is. If appellant were permitted such a return of $40,745 per annum, after providing interest of $4,875 on debt capitalization there would remain $35,870 for earnings for the common stock, or about 27.4% annually,—obviously an unconscionable return which the Commission was quite right in rejecting.

## VI. PREVIOUS RETURNS TO OWNER.

The history of this company as shown by the evidence belies and sets at naught the opinions of its experts. From 1938 through 1941 it paid dividends to its single shareholder of $16,791.60, or $8.50 per share per annum. From 1942 through 1947, the annual dividends were $12,993.50 or $6.50 per share per annum. *In addition to the return to the single shareholder through dividends* there was siphoned off from the net earnings excessive interest, paid to the same single shareholder, the lender of the money. For the years 1943 through 1947 this owner charged 7% on $76,500 lent to the Telephone Company, and charged 5% on $23,000. Under appellant's own evidence the cost of debt capitalization should have been about 3.75% per annum. The accrued interest paid by the Telephone Company to its single shareholder from 1938 to 1947 was $64,886.70. If the single owner had charged interest at 4% (more than appellant's expert fixes) there would have been a saving to the Telephone Company of approximately $25,000; but the lender, being at the same time the owner, took this excess interest of $25,000 just as it took dividends, rather than to put it into the upbuilding of the plant. It seems apparent that this single owner was not interested in improving its plant or service, and of course it did not want to show excessive dividends. All told, from 1938 through 1947, interest and dividends have totalled $210,-000, or approximately $21,000 a year, and, as we have said, the excessive interest approximates $25,000. It is therefore quite apparent that little of the revenues of this company has gone into the betterment of service, and it was stated at argument that as many as twelve persons are on one party line. If, as contended, appellant now needs money to build up its service, it is still true that the cost of the owner's mistakes over the years cannot be passed on to the consumer.

Order affirmed.