## Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued November 21, 1950; reargued April 17, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Anne X. Alpern,* City Solicitor, and *John M. Marshall,* Assistant City Solicitor, for City of Pittsburgh, appellant.

*J. R. Rose,* with him *M. H. Goldstein,* for Pennsylvania Industrial Union Council, intervening appellant.

*Charles E. Thomas,* with him *Arthur J. Diskin* and *Lloyd S. Benjamin,* for Pennsylvania Public Utility Commission, appellee.

*John B. King,* and *Clarence W. Miles,* with them *Paul Maloney, William B. Rafferty* and *E. Everett Mather, Jr.,* for Bell Telephone Company of Pennsylvania, intervening appellee.

OPINION BY ARNOLD, J., July 19, 1951:

This case involves the intrastate rates of the Bell Telephone Company of Pennsylvania (hereinafter called Bell) as fixed by the Public Utility Commission. The tariffs originally filed were suspended by the Commission, and after extended hearings the Commission rendered its report and opinion on October 17, 1949. Bell filed appropriate tariffs according to that order, and the city of Pittsburgh and others appealed. The appeals were argued before us, and on our own motion we directed a reargument. The figures used herein are rounded off.

All the shares of stock of Bell are owned by the American Telephone & Telegraph Company, and the latter also owns 99.8% of the shares of Western Electric Company and 50% of the shares of Bell Laboratories (the remaining portion being owned by Western Electric Company). A. T. & T. operates in 45 states what is known as the "Bell System." Its balance sheet for 1948 shows capital, surplus and undivided profits of $3,092,000,000.[1] In 1950 the same item showed $3,-872,000,000. Its net income was in excess of $207,000,-000 for 1948, and for 1950 was $286,802,000.

---

[1] Company Exhibit 51, page 25.

Bell, its wholly owned subsidiary, is a corporation, the capital, surplus and undivided profits of which for the year 1948 amounted to $229,000,000.[2] Its net income for 1948 was in excess of $12,000,000.[3] Its gross revenues from all sources were $155,480,000 for that year,[3] and the gross operating revenues were $154,-876,000.[3]

The Commission made an allocation between interstate and intrastate property and revenues and expense. It found as of December 31, 1948, that the fair value of its physical property used and useful in Bell's intrastate service was $410,000,000, *including $6,200,-000 for cash working capital.*[4] In determining reproduction cost the Commission considered only 26-month average prices, where previously it had used 5 or 10 year averages. The Commission made an allocation between interstate and intrastate expenses, and on the latter found the operating expense of Bell to be $107,-000,000. Of this sum, $6,000,000 was allowed for the expense of pensions, which will be hereinafter discussed.

It must be recognized that there is always the desire of the utility to get as large a return as possible; and that likewise there is a desire on the part of the ratepayer to buy as cheaply as possible. Only the Commission can stand between the public and the utility. It is almost the only protection which the public has. And we make this observation because the testimony of Bell was that its cost to prepare this rate case was $975,000,—and this *exclusive* of the salaries of its regular employes. The Commission allowed $458,000 as intrastate expense for preparing the case. No protestant

---

[2] Company Exhibit 20-A, page 1.

[3] Company Exhibit 20-A, page 2.

[4] 3299-a, 3300-a.

can possibly bear a similar outlay to prepare its case before the Commission.

By the Act of 1937, 66 PS §1437, this Court is bound by the findings of fact of the Commission if there is evidence to support them. It is only where the utility appeals on the ground of confiscation that we may make independent findings; and confiscation is not involved here. We cannot reverse except for errors of law.

We do not propose to go into all the questions raised on this appeal, but treat only those which we consider merit discussion in the light of the factual findings (by which we are bound). In other respects than noted herein, the Commission is sustained.

## I.

### 26-MONTH AVERAGE PRICES.

Under *Equitable Gas Company v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 463 et seq., 51 A. 2d 497, and the cases therein cited, the Commission must consider "reproduction costs of the property, based upon the fair average price of materials, property and labor. . ." This *reproduction cost* is merely one of six elements entering into the determination of the *fair value* of the physical property. It is solely for the Commission what formula it shall use in determining fair average prices. The Commission determined that a 26-month average price should be applied. Inevitably it is influenced by whether the future holds an increase or decrease in prices. If prices were on a constant level, the reproduction cost would be at current or spot prices, less depreciation. Where the levels are inconstant the judgment of the Commission governs and we cannot substitute our discretion for it: *Blue Mountain Telephone & Telegraph Company v. Pennsylvania Public Utility Commission,* 165 Pa. Su-

perior Ct. 320, 67 A. 2d 441. Cf. *Equitable Gas Company v. Pennsylvania Public Utility Commission,* supra, at pages 464 et seq.

## II.

### ADDING $6,200,000 TO THE FAIR VALUE OF BELL'S PROPERTY AS CASH WORKING CAPITAL.

The Commission added to the present rate base $6,-200,000 as cash working capital. By this allowance the utility had neither more nor less cash than before, for the fair value, or the rate base, concerns only the physical assets of the corporation; that is, neither cash nor current assets are considered. When the cash working capital allowed is added to the physical valuation of the utility, the result is that the utility is permitted to earn 6% on what is but a hypothetical amount, and this without regard to the cash position of the utility.

The whole question of including working capital in a public utility rate base needs to be reexamined. One of the earliest cases in Pennsylvania is *Cheltenham & Abington Sewerage Company v. Public Service Commission,* 122 Pa. Superior Ct. 252, 186 A. 149, where a sewage disposal business was allowed working capital of $2,500 to be added into the rate base of $197,000. This practice has been followed in a number of other cases, in some of which the doctrine was probably extended farther than it should have been.

As time went on, there grew up a regular practice by the Commission always to allow a fund for cash working capital and to include this in the rate base. Primarily this was to take care of the needs of current expenditures over the period of any time lag; but in some cases the Commission has allowed it regardless of any time lag.

In the instant case the principal purpose of including cash working capital in the rate base is to meet a 24-day lag between the use of the service and the payment therefor by the consumer. In other cases, such as *Philadelphia Transportation Company v. Pennsylvania Public Utility Commission,* 155 Pa. Superior Ct. 9, 37 A. 2d 138, the credit of the utility would have been very seriously affected if it had to borrow money.

We are of the opinion that such allowance in the rate base is *not* something to which the utility is *ipso facto* entitled. The matter of the 24-day time lag in the present case must be viewed in connection with other funds of Bell, particularly cash and current assets, which ought to be credited against the cash working capital if such is needed. In other words, Bell is not entitled to "take the cash and let the credit go." In the 1948 balance sheet of Bell the excess of the cash and current assets over current liabilities is $3,000,000. On any amount to be allowed for working capital, the Commission must consider the excess of cash and current assets over current liabilities as averaged over a period of not less than 26 months (the period of time used by Bell in fixing the reproduction value of the plant).

This $6,200,000 allowance enables the utility to collect from its customers (at the 6% allowed return) the sum of $372,000. A. T. & T., the parent company, has been making loans to Bell at 2¾%. It is also notorious that short term loans to a corporation of the wealth of Bell can be made at 2½%,—with the lender well pleased with the bargain. Thus if cash working capital is needed it can be obtained at a cost of $155,000, instead of the imposition of $372,000 upon the ratepayers.

No good reason exists for imposing such a charge on the ratepayers except the custom mentioned, plus

a system of accounting which by its terminology is said to justify the practice. Thus it is stated on behalf of the Commission that its accounting system does not permit charging to operating expense the interest on such short term loans made for working capital. This is but a mere fetish, and neither nomenclature nor a bookkeeping system should stand in the way of justice. Nor in any utility such as Bell can a so-called ratio between debt capital and equity capital be an answer. This, too, is another formula that may or may not have application to other utilities. Nor should such allowance be made to Bell because of its formula, Exhibit No. 21, (which the Commission apparently adopted) computing working capital on the basis of 1/12 of the adjusted net annual expenses. This is little more than words. It is also certain that the credit of Bell will not be adversely affected if short term loans are made to care for the 24-day time lag. A different rule might obtain as to a small utility whose credit is precarious.

Likewise, in addition to the excess of cash and current assets over current liabilities, the Commission should have examined what other cash is ordinarily in the possession of Bell. For instance, the utility set up and the Commission allowed a contemplated expenditure of $12,900,000 for income taxes. As we read the record and the various exhibits, this is not segregated, but is in the nature of a budget item to keep expenditures from impinging upon future tax liabilities. Income taxes are paid in installments for a past period, and there certainly must be available a large amount of cash which can be used temporarily to take care of the time lag, and which can be restored at the expiration of 24 days. We do not agree that the epithets of accounting can affect this matter. There may be, however, some occasion for Bell to make short term

loans at various times, to make good such sums as have been taken from the income tax budget.

For rate making the Commission properly made a separation of the interstate and intrastate business of this utility. But the interstate business of Bell produces a large amount of money which goes into the Bell treasury and is not segregated. If there be a necessity for cash working capital for the interstate business (in this case set up as $800,000);—there is, nevertheless, a large fund available.

Likewise the Commission should examine all other sources of cash "banked" or included in other items of Bell's statement; and other matters pertinent to the issue.

In connection with the cash working capital, and also in connection with the dollar return allowed Bell, the Commission should reexamine the tariffs which were effective as of December 31, 1948. These tariffs have been in force for a considerable period of time. The Commission's approval of the tariffs was in the nature of a prophesy, and experience may now be substituted therefor, and a determination made whether they have produced a dollar return above that allowed by the Commission. In such reexamination the Commission will take such additional testimony as is necessary, and make proper allowance for any new business occasioned through additional facilities and construction, and similar matters.

The finding allowing $6,200,000 cash working capital is reversed.

### III.

### PENSIONS.

In 1913 A. T. & T. set up a pension plan for its employes. It is what may be called a horizontal system, in which the amount of the pension is fixed according

to a formula involving the years of service and the average salary of the employe. The plan calls for no contributions from the employe. Bell of Pennsylvania pays its proportionate share into the pension fund, and the money thus contributed is placed in the hands of trustees and none of it can get back to A. T. & T.

When the pension plan was started, pensions were paid as they accrued. In other words, there was no "fund" but the plan was financed on a pay-as-you-go basis, the pension payments being charged to a balance sheet reserve account, which was kept at its initial level by charging to operating expense annual additions, which were considerably below 2% of the annual payroll.

A. T. & T. was one of the earliest corporations to set up a pension plan and is entitled to great credit therefor. When set up in 1913 there was no experience to furnish a guide. The percentage of the annual payroll gradually increased, and by 1926 it was recognized that eventually it would rise as high as 12%. In 1927 A. T. & T. formally set up a trust *fund* of $35,000,000, of which $5,000,000 was set aside to cover pensions for the then retired employes, and the remaining $30,000,-000 was deposited, interest being derived therefrom.

But on August 10, 1926, Comptroller Heiss of the A. T. & T. gave a written report to his company concerning the increased past service liability, and advised the company to take steps to prevent it mounting. *The report called attention to the fact that. it would be unfair to burden present consumers with past deficiencies.* In 1928 George Buck, consulting actuary to A. T. & T., advised the initiation of freezing payments hereinafter explained.

If the plan had been actuarially sound, the fund would have amounted to some $177,000,000 in 1927; made up of payments during the prior years, and rep-

resenting the amount which, added to expected accruals and future interest accumulations, would meet the probable disbursements of pensions as they became due. The difference between the amount which was on hand and that which should have been in the fund (to make the plan actuarially sound) is usually referred to as unfunded actuarial liability (UAL).[5] This UAL increased after 1927 because the initial accruals were made only for employes having fifteen or more years of service. It was also increased because of the non-existent fund which ought to have been but was not earning interest, which interest is an essential component in the calculations. By 1936 the UAL had increased from $170,000,000 to $187,000,000.

In 1937 there was deposited in the fund an amount equal to interest at 3% on the UAL, so as to "freeze" the UAL at its existing level.[5] The Federal Communications Commission challenged these payments and held that such accruals represented charges *allocable to past fiscal periods* and were not to be charged to current operating expense. The F. C. C. ordered freezing payments to be charged to income. This, however, was only a determination of accounting methods and had no effect on rate making.

---

[5] With his usual clarity, the then counsel for the Commission stated: "The fixed unfunded reserve of $22,800,000 in 1941 and $21,300,000 in 1948 may be described as the additional amount which would have been in the pension fund if full accrual payments had been made to the trustee from the inception of business. Stated in another way, the fixed unfunded reserve in 1941 was the difference between the present worth of all then future pensions, for service prior to 1941, and the actual amount in the pension fund in 1941. The 'freezing' payment is the amount that the fixed unfunded reserve would have earned, at the assumed interest rate of 3 percent, if the unfunded reserve had actually been funded in 1941."

The question arises as to the propriety of charging freezing payments to current operating expense for rate making purposes.[6]

In the instant case the Commission allowed $6,000,-000 as a part of the operating expenses of Bell, being Bell's share of the freezing payments in connection with the UAL. It is perfectly apparent that the effect of the allowance of freezing payments (from 1927 on) was to relieve the consumers of that period, and to place all of that burden on the consumers from 1948 forward.

Whether called a mistake of management, an unwise action, or an error in judgment, it is still a fact that the original pension plan in 1913 was unsound. Nevertheless, because there was a lack of experience with pension funds in industry as a whole, we are of the opinion that Bell should not be charged with the consumers' load from the year 1913 to 1927.

But when the year 1927 came, A. T. & T. knew that freezing payments would have to be made. They were not initiated until 1937, and possibly only then because in that year Congress enacted income tax legislation favorable to corporations making such payments to a pension plan. Since the freezing payments were not made until 1937, it is beyond all doubt that the consumers from 1927 to 1937, and from then forward, escaped the cost which should have been borne by the revenues of Bell of Pa. and which was acquired by payment of the rates by the consumer. It also follows that past consumers escaped the increased cost not only from 1927 to 1937, but escaped all the increased cost until 1941, when the full freezing payments were

---

[6] On a pay-as-you-go basis we glean from the record that the pension expense would vary from $103,000 in 1941 to $182,000 in 1948; on the actuarial basis the variance was from $2,000,000 in 1941 to $5,600,000 in 1948.

made. In other words, the freezing payments that should have been made, and were made from 1941 on, included amounts which the ratepayers from 1927 (actually 1913) to 1948 should have paid.

The present consumers, by means of an increased rate or tariff, cannot be saddled with the deficiency in the payments to the pension fund running from 1927. By the action of the Commission this $6,000,000 freezing payment goes into the increased rates of the new tariffs. If the plan had been on an actuarially sound basis in 1927, the ratepayers (presumably) each year thereafter would have contributed a larger sum than they did, and the present ratepayers would be relieved of a considerable portion of that which was the burden of the prior ratepayer.

Whatever was the cause of the original decision in 1913 to place the fund on a pay-as-you-go basis; or whatever was the cause of A. T. & T. not going on an actuarially sound basis in 1927;—it is certain that such decisions were not of the ratepayers. The longer the freezing payments were delayed, the larger the payments had to be.

A very careful and clear statement of all of the questions involved appears in 64 Harvard Law Review 633, with annotations. We have adopted much from this article, which annotates the various decisions of the commissions and courts.

One view allows the freezing payments to be charged to current expense, but such decisions consider only that the expenditures are needed to maintain the solvency of the fund.[7] Obviously this fails to prove that, *for rate making purposes*, the payment should be allowed as an operating expense. Another view disallows

---

[7] In addition to the cases cited in 64 Harvard Law Review is the recent case: Petitions of New England Tel. & Tel. Co., Supreme Court of Vermont, rendered May 1, 1951, 80 A. 2d 671.

the payments as charges to operating expense, and frequently it is stated that they are past accruals and hence not chargeable to present consumers. If applied to the years from 1913 to 1927 this disregards the reasonableness of the company's conduct and the extent to which present consumers are being unfairly burdened. A third view allows only pension disbursements to be charged to operating expense, but this has been abandoned in most jurisdictions. A fourth view permits only a part of the freezing payments to be charged as operating expense, and in many instances this has been done by applying arbitrary percentages in a desire to compromise conflicting interests. But at least one commission has arrived at a more reasonable conclusion. In New York Telephone Company, 84 PUR (N.S.) 267, the commission disallowed that part of the freezing payment attributed to the increase in the UAL *since 1937*. With the major part of that decision we fully concur, except that in our opinion the year 1937 has nothing to do with the matter. That was merely the time when legislation was enacted by Congress which gave a tax advantage to A. T. & T. and its pension plan. It must be kept in mind that probably no part of the freezing payments need be chargeable to operating expense if the company had funded its past service in 1927 when it was first authorized so to do; and if it had done that, probably all of the UAL would now be eliminated and freezing payments unnecessary.

We therefore remand this matter to the Commission to take such evidence as may be necessary to determine what part of the freezing payments made from 1927 through 1948 should have been borne by the consumers prior to 1948, and to reduce the amount of $6,000,000 (allowed as an expenditure to Bell) by the sum thus found.

The decision of the Public Utility Commission is reversed, the record is remanded for the taking of tes-

timony and for making of findings in accordance with this opinion, and, after the adjustment of the former findings, to require new tariffs to be filed in conformity therewith.

RHODES, P. J., RENO & ROSS, JJ., concur in part and dissent in part.

———

DISSENTING OPINION BY RHODES, P. J.:

I dissent from that portion of the majority opinion which treats of respondent's (intervening appellee's) reproduction cost estimate based on 26-month average prices extending from April 1, 1946, to May 31, 1948. At the hearing on January 20, 1949, counsel for the Commission on the record requested respondent to present reproduction cost estimates based on 5-year average prices and 10-year average prices. This the respondent refused to do.

It is true that reproduction cost is merely one of the elements entering into the determination of fair value of the property of a utility; and the weight to be given a reproduction cost finding is for the Commission. In arriving at a fair value of respondent's property, the Commission used respondent's estimate of reproduction cost. It does not appear that the Commission made an explicit finding of reproduction cost. It merely said: "Our finding with respect to a measure of value based upon depreciated original cost, related to intrastate operations, totals $358,121,177. Were we to apply the same ratio for accrued depreciation as we did with respect to original cost, the corresponding amount based upon 26 months' depreciated reproduction cost would approximate $478,126,897."

The Commission in its order also made this statement: "In determining the reasonableness of the rates of a public utility, we are required, in arriving at the fair value of property used and useful in the public service, to give consideration to reproduction cost of

property based upon the fair average price of materials, property and labor. Therefore to comply with the requirement of law that we give consideration to 'reproduction cost at the fair average price of materials, property and labor,' we shall review and analyze respondent's reproduction cost estimate based on the average prices of the noted 26 months' period and in determining the issues involved in these proceedings will give such weight to this reproduction cost estimate as it merits (Blue Mountain Telephone and Telegraph Company v. Pa. P.U.C., 165 Pa. Superior Ct. 320, 327)."

The Commission did not approve or disapprove of the 26-month price average, and it did not find that such price average was fair or representative, or that the 26-month period was a fair period for such purpose. I am of the opinion that it must appear from a finding supported by evidence that the average prices used in a reproduction cost estimate covered a fair period and were representative and the "fair average price of materials, property, and labor as required by law." *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 525, 69 A. 2d 844, 847. See *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 463, 51 A. 2d 497. If such measure of value submitted by respondent does not comply with this requirement, it does not merit any consideration. Whether such measure of value as submitted meets the legal requirement is a question of law, and subject to review by this Court. To be fair and representative, average prices must relate to a fair period or cover a sufficient extent of time so that they do not reflect merely unusual or temporary economic conditions. Whether or not it is a *fair* period is a question of fact with which the Court will not interfere if the finding is supported by competent evidence. It is not a matter of discretion on the part of the Commission; it is a matter of evidence and a finding. The use of

abnormally low price levels would be no more proper than the use of relatively high price levels at the discretion of the Commission. If respondent's rates were reduced and it claimed confiscation because a short period of low prices was selected for the determination of reproduction cost, I question that we would sustain the Commission on the ground that the matter was "solely for the Commission." Exercising our independent judicial judgment, we would probably be obliged to remand the case or, from the evidence, make our own finding of a fair average. In the absence of a Commission finding as to the use of 26-month average prices, the consideration by the Commission of the reproduction cost estimate submitted by respondent was an error of law, and in remanding this case we should require a finding by the Commission which we could review in the light of the supporting evidence, if any.

Furthermore, we recognize that some matters as, for example, accrued depreciation is essentially for the exercise of the Commission's judgment. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 526, 69 A. 2d 844; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 108, 78 A. 2d 35. And, in forecasting probable future revenues under a given tariff, the Commission must necessarily have the power to exercise its own judgment "upon a view of all the relevant circumstances." *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 168 Pa. Superior Ct. 95, 106, 78 A. 2d 35, 40. But I think the statement in the majority opinion to the effect that the judgment of the Commission is supreme whether the future holds an increase or decrease in prices may be misconstrued and misapplied. In finding the present fair value, future values, greater or less, are not part of the picture.

In *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 466, 51

A. 2d 497, 501, we said: "It is sufficient to note that the reproduction cost estimates were based upon spot prices. . . . In cases involving reproduction cost estimates a five or ten year average has been generally used. The commission therefore concluded that the spot pricing of December 31, 1938, produced a figure fairly comparable to a reproduction estimate based on average prices over any reasonable number of recent normal years." The Commission's finding in that case of fair value was as of December 31, 1944.

In *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 519, 525, 69 A. 2d 844, 847, we said: "Notwithstanding its disapproval of five year average prices and its conclusion that they were unrepresentative, the Commission gave weight in determining the rate base to reproduction cost based on such averages. Either five year average prices were representative and entitled to be used in a finding of reproduction cost in this case or they were not."

In *Blue Mountain Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 320, 67 A. 2d 441, reproduction cost based on 10-year average prices as a standard for reproduction costs was affirmed by this Court.

The *Blue Mountain* case furnishes a striking contrast with the present case. In that case the Commission resorted to 10-year average prices in finding reproduction cost in the amount of $330,300. In the present case the Commission allowed a 26-month price average covering a relatively high period of price levels, and accepted respondent's estimate of reproduction cost based thereon. Respondent's reproduction cost estimate depreciated apparently used by the Commission was approximately $478,126,897. Respondent is a wholly owned subsidiary of the American Telephone & Telegraph Company, a multibillion dollar corporation. The majority opinion has this significant statement

with which I fully agree: "Only the Commission can stand between the public and the utility. It is almost the only protection which the public has." In performing its duty in this respect, the Commission should not allow itself to be overwhelmed by respondent's magnitude or the methods used "to get as large a return as possible." As long as rate making in Pennsylvania requires consideration of such an artificial and unrealistic element as reproduction cost, the estimate used should not be weighted in favor of the utility.

I am also of the opinion that a 6 per cent rate of return allowed by the Commission on a fair value finding of respondent's property is arbitrary. In *Blue Mountain Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 320, 329, 67 A. 2d 441, 446, we said: "Appellant vigorously contends that it is entitled to a 7.25% return, on the opinion evidence of the appellant. Under the circumstances here existing no fault can be found with the Commission for fixing the rate of return at 6%." If the Blue Mountain Company, with a fair value of $325,000 requires only a 6 per cent return to attract capital and to keep its enterprise stable and profitable, certainly an allowance of 6 per cent return for respondent is unconscionable. In its order the Commission said: "A fair return must enable respondent to maintain its credit and attract necessary capital. Respondent's financial reputation and ability to maintain its general credit or attract new capital is greatly enhanced by its inclusion in the Bell System family which the United States Supreme Court has characterized as no 'ordinary public utility,' Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 161 (1930). As an integral part of the nationwide Bell System, respondent not only has unique advantages in obtaining credit or new capital, but through affiliated sources of production and research, respondent has immediate access

to any improvements in equipment or operating methods that result in [economies]." In my judgment, the allowable return may not exceed 5.74% on this record.

In remanding the record to the Commission for further consideration, we should require the Commission's reconsideration of reproduction cost and rate of return; the fair value of respondent's property for rate making purposes and the allowable return from the tariffs should be revised to comply with the evidence and the law.

RENO and ROSS, JJ. join in this dissent.