Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 25, 1953. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ.

*Anne X. Alpern,* City Solicitor, for City of Pittsburgh, appellant.

*James L. Stern,* Assistant City Solicitor, with him *Abraham L. Freedman,* City Solicitor, for City of Philadelphia, appellant.

*Joseph R. Rose,* with him *M. H. Goldstein,* for Pennsylvania C.I.O. Council, appellant.

*William J. Grove,* Assistant Counsel, with him *Lloyd S. Benjamin,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*Clarence W. Miles,* with him *William B. Rafferty* and *John B. King,* for Bell Telephone Company of Pennsylvania, intervening appellee.

OPINION BY GUNTHER, J., July 14, 1953:

Bell Telephone Company of Pennsylvania (hereinafter called Bell) filed with the Public Utility Commission a proposed tariff for increased rates on January 7, 1952, expected to produce an increase in annual revenue of about $33,000,000. The rates were suspended by the Commission until December 7, 1952. After extended hearings the Commission issued an order December 1, 1952, authorizing rate increases totaling over $21,000,000.

The Cities of Pittsburgh and Philadelphia and the Pennsylvania C.I.O. Council have appealed from the Commission's order, alleging error in the findings relating to accrued depreciation and reproduction cost.

1. *Accrued Depreciation.* The Commission was presented with three measures of accrued depreciation: Bell's book reserve for depreciation, reserve requirement study, and Bell's own estimate of 24.83%. The latter was arrived at by starting with the Commission's finding of accrued depreciation of 28.06% as of December 1, 1948, when the previous hearings were held, and working forward to 1952 by estimating the change in depreciation. The earlier finding was based upon a detailed study of the actual depreciation of that time and such finding was affirmed by this Court in *Pittsburgh v. Pa. P.U.C.*, 169 Pa. Superior Ct. 400, 82 A. 2d 515. After study of these three factors, the Commission concluded that the accrued depreciation was 26% as to original cost, and 29% as to reproduction cost.

The order of the Commission must be affirmed if supported by sufficient competent evidence, and if no errors of law appear. *Pittsburgh v. Pa. P.U.C.*, 165 Pa. Superior Ct. 519, 69 A. 2d 844. Of the three measurements appellants have no quarrel with the first two, but maintain that Bell's estimate of accrued depreciation was based upon incompetent evidence.

We see no error in the admission of Bell's study of relative depreciation between 1948 and 1952. It is true that the Commission in its order states that Bell's estimate of accrued depreciation is not a study of the absolute depreciation as of 1952, but only of relative depreciation. Yet that is exactly why it was introduced into evidence, and there is nothing to indicate that the Commission considered it as more than a reasonable estimate. Since a finding of accrued depreciation was made less than four years earlier, there is no reason to require a completely new total appraisal of all Bell's assets. The prior finding is entitled to full consideration, though not res adjudicata. *Philadelphia v. Pa. P.U.C.*, 162 Pa. Superior Ct. 425, 57 A. 2d 613.

From that prior finding, Bell revised its estimate downward based on evidence that it has enormously expanded new plant in three years, and on the decrease in depreciation reserve requirements. The record is replete with testimony regarding the installation of vast new plant in the last few years. The three General Plant Managers of Bell testified at length and gave conclusions on depreciation based on physical inspections and consideration of such factors as the relative amounts of found troubles, 1948 as compared to 1951-52.

Appellants further complain that there was no evidence of obsolescence or inadequacy as to most of Bell's plant. Bell's engineer testified as to these factors only as to 7% of the plant, on the theory that these factors are undeterminable as to that portion of the plant for which no requirement plans have been made. The Commission therefore had before it an absolute evaluation of depreciation on only 7% of the plant, and a relative evaluation as to the remainder. While we do not say that this is the best method of estimating accrued depreciation, it is not therefore completely without merit. The Commission did not, as appellants state, declare Bell's method of estimate invalid. The weight to be given such estimate is, however, up to the judgment of the Commission.

Appellants admit the competency of the book reserve for depreciation and the reserve requirement study and contend that they are the only competent measures introduced into evidence. In view of what we have said above, we disagree and hold that the Commission also properly gave consideration to Bell's estimate based upon relative depreciation. "The Commission was not bound to accept any particular method of estimating accrued depreciation." *Pittsburgh v. Pa. P.U.C.*, 171 Pa. Superior Ct. 187, p. 206, 90 A. 2d 607. The findings in respect to this factor necessarily repre-

sent a judgment figure, and the exact weight to be given any particular estimate is for the Commission alone. *Blue Mountain Telephone & Telegraph Co. v. Pa. P.U.C.*, 165 Pa. Superior Ct. 320, 67 A. 2d 441.

The final complaint on this subject is that the Commission went outside the record in making its conclusions. After concluding that Bell's accrued depreciation was 26% as to original cost, the Commission corrected that figure to 29% with respect to reproduction cost on the basis of its knowledge of the effect of the generally rising price level during the past forty years. The order stated that recent cases had indicated a certain general percentage spread between the two applications of accrued depreciation and the Commission used the knowledge gained therein as a spring-board for its revision from 26% to 29%.

2. *Reproduction Cost.* In finding fair value the Commission considered depreciated original cost, depreciated reproduction cost based on average prices for periods of from one year to five years, and on a spot price, dated during the hearings. Appellants contend that the Commission erred in not requiring Bell to submit estimates based on a ten year average price period. They cite *Pittsburgh v. Pa. P.U.C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607, which held that the Commission erred in refusing consideration of evidence offered to show ten year average prices. There is no question here of refusing to consider evidence; appellants, in effect, are asking us to hold that the Commission *must* require a ten year price study. This we have never held and do not now do so. Although ten year price studies have been used and approved, *Equitable Gas Co. v. Pa. P.U.C.*, 160 Pa. Superior Ct. 458, 51 A. 2d 497, we have also affirmed findings based on studies of five years and even less. Thus, in *Pittsburgh v. Pa.*

*P.U.C.,* 169 Pa. Superior Ct. 400, 82 A. 2d 515, we upheld the right of the Commission to base its findings on a study of 26 months average prices. If price "levels are inconstant the judgment of the Commission governs and we cannot substitute our discretion for it." *Pittsburgh v. Pa. P.U.C.,* 169 Pa. Superior Ct. 400, p. 405. The Commission found six different measures of value: original cost and reproduction cost at one, two, three, four and five year price levels. It gave the several measures of value such consideration as it found to be just and proper, and we cannot substitute our judgment by requiring a ten year study.

Appellants further object to the consideration given to one of Bell's four methods of reproduction cost estimates. In trending original cost in regard only to a portion of its plant, Bell used price indices supplied by Western Electric Company. The complaint now is that although the index numbers were introduced into evidence the complete indices themselves were not offered. Yet the record discloses that appellants did not request the production of these indices, or even ask the expert witness testifying in regard to them to produce samples of the original indices. This is a system which has often been used to trend prices and was explained fully and carefully by Bell's witness. It is not apparent why an enormously voluminous set of exhibits should be required as evidence when a more reasonable synopsis thereof is introduced and carefully explained and correlated. The testimony establishes that the price indices related to typical equipment sold by Western Electric Company to Bell for all the latter's plants throughout the country, and the standardization of such equipment was adequately set forth. The possible weaknesses in the price index trending system were recognized by the Commission, which, however, found it to be a reasonably accurate set of index numbers.

The weight to be given them is, of course, for the Commission.

Order affirmed.

President Judge RHODES and Judge Ross dissent.

WRIGHT, J., took no part in the consideration or decision of this case.

_____

DISSENTING OPINION BY RHODES, P. J.:

In my judgment the requirements of the Public Utility Law of 1937 were not properly followed by the Commission in this case. Therefore, I would return the record to the Commission that it might exercise its administrative discretion on the material facts after they have been properly and legally found. The issue is "fair value," which the Commission found to be $528,000,000. The Commission, as to intrastate operations of the Company, had found original cost depreciated to be $455,346,839, and the five findings as to reproduction cost depreciated were $611,433,708 at average prices for one-year period, $618,459,094 for two-year period, $601,158,798 for three-year period, $592,233,271 for four-year period, and $582,624,609 for five-year period. The Commission by its order of October 17, 1949, allowed this Company to increase its rates so as to provide additional annual operating revenues of $17,963,000, which amount was subsequently reduced by $620,000. *Pittsburgh v. Pennsylvania Public Utility Commission,* 169 Pa. Superior Ct. 400, 82 A. 2d 515; 370 Pa. 305, 88 A. 2d 59. The present tariffs were filed on January 7, 1952, and the Commission by its order of December 1, 1952, allowed a further increase in operating revenues of this Company of $21,227,069.

This case illustrates the difficulty confronting the Commission in attempting to properly analyze and ap-

praise the mass of data presented by the utility in its own way from its own records. For any protestant to refute such evidence is impossible. It suffices to present one illustration. In referring to reproduction cost the Commission in its report and order stated: "The 'reproduction cost' of this portion of the plant (less land and buildings) was estimated by the use of (1) book cost, (2) trended original cost, and (3) reproduction cost by the 'principal item method.' ... Respondent used construction cost index numbers in its trending of the original cost of most central office equipment and of certain classes of private branch exchanges. The index numbers were supplied by Western Electric Company, ..."

Also, in the Commission's brief the following appears: "The Commission in its Order sets forth in detail the manner by which the index numbers for step by step central office equipment were determined: for the period 1947 to date index numbers for step by step central office equipment are based on an actual central office in service in El Paso, Texas; from 1940-1946, they are based on an actual central office in Raleigh, North Carolina; from 1926-1939 they are based on a theoretical central office; and, prior to 1926, upon an actual or hypothetical central office. The composition of these indices was given by Mr. J. W. Myers, Price Manager of Western Electric Company."

Index numbers are derived from price indices which are not of record, and such index numbers enter into the estimate of reproduction cost. It is obvious that the method used for the determination of reproduction cost of the Company's plant is highly technical and the result is theoretical and entirely unrealistic. Although the Commission said "The record contains no information from which to evaluate the possible errors in these index numbers," it nevertheless gave weight to

reproduction cost based on such unreliable data. The result is merely an estimate upon an estimate. The objection is not as to the weight to be given the evidence, that is, index numbers, but concerns its competency as evidence to support the Commission's finding. The use of such evidence possibly reduces the size of the record which would be greatly expanded if there was adherence to the rule of evidence relating to competency. But, as said in *New Jersey Bell Telephone Company v. State of New Jersey, Department of Public Utilities, Board of Public Utility Commissioners,* 12 N. J. 568: "Although reproduction cost is evidential the proofs in support thereof must be clear enough to establish the opinion beyond mere conjecture." In the same opinion, sustaining the denial of increase in rates of the utility, the Supreme Court of New Jersey, relying upon the Supreme Court of the United States, said, in ascertaining the rate base of the utility, that the cost of reproduction is a guide but not a measure. See *Los Angeles Gas & Electric Corp. v. Railroad Commission,* 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U. S. 290, 311, 54 S. Ct. 647, 78 L. Ed. 1267, 1281.

The calculation of accrued depreciation applicable to reproduction cost is questionable. The Commission in this respect said: "It has been our experience, with the generally rising price level this country has experienced during the last 40 years, that ratios of accrued depreciation, with respect to reproduction cost and to trended original cost, are always greater than with respect to original cost. This is so because the proportion of older dollars increases when brought to a constant dollar basis because of the lower price levels in earlier years. We have found in a number of recent cases that this spread ranges from about three percent-

age points to about eight percentage points. While these determinations in other proceedings are not controlling, they give us the general relationship of these ratios.

"Accordingly, we find that accrued depreciation at June 30, 1952, applicable to all 'reproduction cost' estimates at the five different price levels is 29 per cent."

Although the Commission is not obliged to accept any particular method of estimating accrued depreciation, its finding must be based on the record.

Furthermore, I find no basis in fact or in law for the Commission to rely on the Company's depreciation study of relatives, which shows merely the claimed relationship of depreciation at December 31, 1951, to that at December 31, 1948. The Commission significantly went on to say: "While Company Exhibit 20 reflects absolute depreciation and contains all the elements of depreciation, it is with respect to only 6.9 per cent of total plant. On the balance of 93.1 per cent of total plant, respondent's depreciation study shows only that the physical depreciation at the end of 1951 is less than it was at the end of 1948. Accordingly, upon this 93.1 per cent portion we have no evaluation of the physical depreciation nor of the total depreciation at this time, but merely that relatively the physical depreciation is less than it was in 1948. Respondent in its 'depreciation study' does not determine an absolute measure of all the elements of depreciation at June 30, 1952, nor at any other time, applicable to its entire plant."

In addition, I am of the opinion the Commission did not make the necessary ultimate finding as to reproduction cost. Admittedly, under the law of this Commonwealth, it was proper for the Commission to consider original cost and reproduction cost as measures of value in determining fair value in this rate

case. Thus, in *Solar Electric Co. v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 325, 336, 9 A. 2d 447, 457, we said: "While the new act (Public Utility Law) does not go into details as to the items which should be considered by the commission in fixing the fair value of a utility's property, as fully as the old act (Public Service Company Law) did, this was not because of any intention to change the law in this respect . . ."

We reiterated this principle in *Peoples Natural Gas v. Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 475, 488, 489, 34 A. 2d 375.

In *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 51 A. 2d 497, we repeated those items which had been thereby written into the Public Utility Law of 1937. They are: (1) Original cost of construction of the utility's property; (2) the market value of its bonds and stocks; (3) the probable earning capacity under the rates fixed by the Commission; (4) expenditures for obsolete equipment and construction; (5) reproduction costs of the property, based upon the fair average price of materials, property and labor; (6) developmental and going concern value.

We also said in *Pittsburgh v. Pennsylvania Public Utility Commission,* 169 Pa. Superior Ct. 400, 405, 82 A. 2d 515: "Under Equitable Gas Company v. Pennsylvania Public Utility Commission, 160 Pa. Superior Ct. 458, 463 et seq., 51 A. 2d 497, and the cases therein cited, the Commission must consider 'reproduction costs of the property, based upon the fair average price of materials, property and labor . . .' This *reproduction cost* is merely one of six elements entering into the determination of the *fair value* of the physical property."

Recently in *Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 198, 199, 90 A. 2d 607, we said: "Under the fair value rule prevailing in this state, consideration should be given to original cost and *average price* reproduction cost of the property; it was never intended that fair value be the equivalent of market price or cost at current prices." Thus, it is a legal requirement that a reproduction cost finding be based upon the fair average price of materials, property, and labor. The Company in its brief stated: "Obviously what is a fair average price to be used must vary with the circumstances of the particular case. What is fair in one case might be grossly unfair in another." This is a factual matter for the Commission to determine. But the Commission made no finding that any one of the reproduction cost estimates was based upon average prices for a fair period or that such prices were representative. Certainly the five reproduction cost estimates cannot all be relevant and applicable in the determination of fair value. In the previous case involving the present intervening appellee, *Pittsburgh v. Pennsylvania Public Utility Commission,* 169 Pa. Superior Ct. 400, 82 A. 2d 515, the reproduction cost estimate was based upon the average prices for 26-month period, and this was sustained by a majority of this Court, apparently on the assumption that the average prices for that period were representative and therefore properly used in estimating reproduction cost. It may not be necessary in every case for the Commission to require ten-year averages to be used in the preparation of such an estimate. But in my judgment the introduction into the record of a number of reproduction cost estimates requires a finding as to which is the result of fair average prices representative under the circumstances. "The obvious purpose of the requirement of 'fair average prices' is to avoid

the use of the high or the low prices over a given period, and in this way to arrive at a valuation that is fair to all interests, both to the utility and to the consumer or customer. And an average having a broad base will rest on a more solid foundation than a short term average or a cost based on spot prices": *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 197, 90 A. 2d 607.

The Commission's report and order significantly contains a recital of the Company's attitude in this case. "Subsequently respondent presented evidence of 'reproduction cost' based upon the average prices obtaining for the one-year period, July 1, 1950 to June 30, 1951. . . . In response to a request of Commission Counsel, respondent stated that at that time it had no intention of offering any testimony with respect to any average prices other than the one-year average.

"However, respondent later offered evidence of 're-production cost' at the average prices for the two-year period ended June 30, 1952. In addition, respondent prepared and furnished to all the parties a 'reproduction cost' based on the average prices for the three years ended June 30, 1952, but declined to offer this estimate in evidence 'because we believe that a three-year period is inappropriate as not reflecting a fair average price basis.'

"Following this, Commission Counsel stated on the record that he had been authorized by the Commission to request respondent to furnish the necessary indices so that the Commission might determine reproduction cost at any price level from one to five years. This request of Commission Counsel was formally and precisely stated on the record at pages 559 and 560 of the transcript. In response to this formal Commission request, respondent stated that 'The company has con-

cluded that it must decline to prepare such material.' . . .

"By our order of August 12, 1952 in these proceedings, respondent was required to furnish the necessary index numbers to enable us to prepare estimates of 'reproduction cost' at different price levels throughout the five-year period ended June 30, 1952. In lieu of furnishing index numbers and in accordance with the alternative provided in the said order, respondent prepared estimates of 'reproduction cost' based on the average prices, respectively, for the four years and five years ended June 30, 1952.

"The three-year, four-year and five-year average price 'reproduction cost' estimates prepared by respondent are marked Commission exhibits 5, 6, 7, 9 and 10."

Under such circumstances, the Commission would have been justified in excluding from consideration the Company's reproduction cost estimates. See Act of May 28, 1937, P. L. 1053, Art. IX, §906, 66 PS §1346.

The information requested by the Commission was to aid it in the determination of the value of the Company's property. The Company failed to cooperate with the Commission or to comply with section 906 of the Public Utility Law, 66 PS §1346.

The burden of proof in this rate case was upon the Company. Section 312, Art. III, Act of May 28, 1937, P. L. 1053, 66 PS §1152. The Commission should have recognized this fact more fully and weighed the Company's evidence accordingly. While the Commission is concerned that a public utility receive a fair return that it may render adequate service to the public, it is likewise the Commission's duty to be vigilant in protecting the public from unjust and unreasonable rates.

The record should be returned to the Commission for a proper determination of the fair value of the

Company's property used and useful in the public service.

Judge Ross joins in this dissent.