Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

364

Argued November 18, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER and WRIGHT, JJ.

*Anne X. Alpern,* City Solicitor, with her *David Stahl,* Assistant City Solicitor, for City of Pittsburgh, appellant.

*J. E. Fullerton,* with him *Albert E. Luttrell,* Assistant Counsel and *Lloyd S. Benjamin,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*Ernest R. von Starck,* with him *Robert H. Young, Joseph A. Beck* and *Morgan, Lewis & Bockius,* for The South Pittsburgh Water Company, intervenor, appellee.

OPINION BY HIRT, J., January 2, 1954:

The South Pittsburgh Water Company, a private corporate entity, serves twenty-one boroughs and nine townships in the metropolitan area of South Hills lying south of the Monongahela River. In addition, the Company serves all or parts of nine wards of the City of Pittsburgh within that area. In October 1951 the Company filed with the Pennsylvania Public Utility Commission its tariff Number 11, providing for substantial increases in all of its metered water rates. The effective date of the tariff, by successive orders of the Commission, was extended for a total of nine months to October 1, 1952. On July 1, 1952 the Commission of its own motion initiated an investigation to determine the legality and fairness of the proposed rates. The City of Pittsburgh and an individual resident affected by the tariff, filed complaints against the proposed rates which were consolidated for hearing with the Commission's investigation.

The thoroughness with which every phase of the consolidated proceeding was presented is attested by the scope and extent of the testimony and the numerous exhibits in this record. As measures of value at December 31, 1951, the Company's proofs of value, in each instance less accrued depreciation, compared with the Commission's findings, may thus be stated:

|  | Company Proof | Commission Finding |
|---|---|---|
| Original Cost | $16,909,850 | 14,694,919 |
| Reproduction Cost—spot prices Dec. 31, 1951 | 35,764,326 | 31,489,035 |
| Reproduction Cost — average prices 1947 thru 1951 | 31,213,053 | 27,432,339 |

Based upon these findings, the Commission adopted $21,000,000 as the fair value of the Company's prop-

erty as of December 31, 1951 and from its estimates of total anticipated operating revenues, in relation to operating expenses, the Commission found $1,220,-813 as the net amount of operating income. This estimated net revenue constituted a return of 5.81% on the fair value finding of $21,000,000, which the Commission concluded "was not in excess of any fair rate of return finding justified by this record." Accordingly 5.81% was approved as the allowable rate of return.

The difference between the Company's claimed costs reflecting fair value, and the Commission's findings, is accounted for largely by the elimination by the Commission of $1,441,853, the cost of construction work in progress, none of which was in service on December 31, 1951. Construction overheads entering into the Company's computations of reproduction cost were also eliminated to the extent of about one and one-half millions of dollars. By judgment figures the Commission in its findings, increased the Company's estimates of accrued depreciation, resulting in further reductions in the costs of company property reflecting fair value. The endeavor of the City before the Commission was to reduce the rate base still further by higher estimates of accrued depreciation. Accrued depreciation in determining fair value in a rate case must be deducted from computations of original cost and of reproduction cost, as representing the loss in service value which has accrued in the property since the date of its first use. The Commission in computing accrued depreciation, used the compound interest method. The actual calculation of depreciation in the application of this method consists in the determination of the base amount or annuity which when capitalized at an appropriate rate during the life of the plant will return to the Company the entire cost of the property. The charge for

the first year is the annuity. The charge for each succeeding year is the annuity plus interest for one year at 4%, the rate adopted by the Commission, on the *compound* amount of the annuities at the first of the year. In the present appeal the City would have us say as a matter of law that there is error in the Commission's use of the compound interest method in estimating accrued depreciation. The City contends that accrued depreciation could properly be measured only by the straight line method which spreads the entire cost of the property, to be recouped, in equal annual accruals over the service life of the property.

The determination of accrued depreciation presents an old problem, broad and complex in its many aspects. *Cheltenham & Abington S. Co. v. P. S. C.,* 122 Pa. Superior Ct. 252, 186 A. 149. In the present order the Commission dealt with the problem in the light of historical practice as applied to water companies. The order of the Commission contains this comment: "Water utilities in Pennsylvania, throughout their regulatory life, have generally based their provisions for depreciation of plant on the premise that such plant depreciates very slowly in the early years and very rapidly as it nears retirement. Based on this conception, there developed the practice, recognized by regulatory authority, of making charges on the books annually for depreciation to carry this into effect; of course, there were exceptions. Therefore, the depreciation reserve accumulations proceeded at a relatively slow rate, with the result that at any given date in most situations, the depreciation reserve for a well operated and maintained waterworks system is smaller than if the basic initial conception was that an equal amount of depreciation accrued each year during the total service life. During the history of rate regulation in Pennsylvania, this Commission has accepted

the use of the 4 per cent compound interest method of determining annual and accrued depreciation for water utilities which enabled it to establish reasonable rates without causing violent dislocation of the financial integrity of the regulated utility with all of its economic implications."

The Commission was supported in the use of the compound interest method, as an aid in determining accrued depreciation, by Nathan B. Jacobs, a qualified engineer who was well acquainted with the Company's property; in fact the accrued depreciation study was made under his supervision. As his reason for selecting the 4% compound interest method he said: "I think it more nearly represents the declining service value of the property in a water works than any of the other methods of computing depreciation. The straight line method takes an equal amount each year over the whole life of the property. The sinking fund method and the compound interest method start out with a smaller amount in the early years with a very rapidly increasing amount of depreciation towards the end of the life of the property and that is when obsolescence and inadequacy are beginning to show themselves and actually taking place in the property itself and it comes closer, in our experience with the observed method of depreciation whereby you attempt to determine the remaining service value in a property considering the condition in which we find the property, the condition of the art under which the property was installed or designed and its adequacy and obsolescence." The testimony of a second expert witness for the Company may be ignored on this phase of the investigation since the Commission did not accept it as support for the claim "that depreciation progresses according to a geometric curve." Against the Company's evidence the City's expert, Martin T. Bennett, a well qualified engineer,

advocated the use of the straight line method and stated the reasons for his preference. The weight of the testimony was for the Commission although the choice of method was not dependent upon opinion evidence. Both straight line and compound interest methods are recognized standard procedures. Which of the two is the better guide to a determination of accrued depreciation, under all of the circumstances of a given case, is for the Commission to decide. The decision of the Commission in this respect does not require support by testimony either as to the validity of one method over another or its applicability to the utility under investigation in the light of the character of the utility and the kind of public service rendered by it.

While the Commission might have measured accrued depreciation by some formula other than that indicated by the compound interest method, a complete answer to the City's contention is the fact that it did not. As recently as in *Pittsburgh v. P. U. C.*, 174 Pa. Superior Ct. 4, 8, 98 A. 2d 249, we said: " 'The Commission was not bound to accept any particular method of estimating accrued depreciation.' Pittsburgh v. Pa. P. U. C., 171 Pa. Superior Ct. 187, p. 206, 90 A. 2d 607. The findings in respect to this factor necessarily represent a judgment figure, and the exact weight to be given any particular estimate is for the Commission alone. Blue Mountain Telephone & Telegraph Co. v. Pa. P. U. C., 165 Pa. Superior Ct. 320, 67 A. 2d 441." The determination of accrued depreciation by the Commission is essentially a matter of judgment. *Pittsburgh v. Pa. P. U. C.*, 168 Pa. Superior Ct. 95, 78 A. 2d 35. In the present case the Commission properly considered the results of the application of the compound interest method as guides merely, rather than as absolute measures of accrued depreciation. Cf. *Cheltenham & Abington S. Co. v. P. S. C.*, supra. The

Commission's findings of accrued depreciation applicable to original cost and to reproduction costs were judgment figures which were higher in each instance than as computed by the strict application of the compound interest formula. Moreover there is no merit in the City's contention that the compound interest method will result in substantially greater returns to the company than the method contended for. Under either the compound interest method or the straight line method a company will have received no more than the total cost of its property at the end of its useful life if the systems are properly applied. We may assume that the Commission will insure its proper application in this case.

The distribution system within the nine wards of the City of Pittsburgh was installed by the Company and was owned by it. The Commission properly included the value of this property in the rate base notwithstanding payments by the City to the Company under the terms of a contract entered into by them in 1941 which had the approval of the Commission. Under the contract the Company sold water to the City at wholesale for resale by it to approximately 24,500 consumers within the area served by the Company's distribution system. In substance the contract provided for the reading of the meters of the consumers within the City by the Company's meter readers; the City was charged with the total of all meter readings and paid for the water consumed at the Company's current rates as though for consumption by a single customer. Payment was also provided for public fire service based on the Company's rates. The Company was bound to operate and maintain its distribution system within the City but the City obligated itself to reimburse the Company for the operating and maintenance expense. In consideration of the services to be

rendered by the Company and the sale of water at the wholesale rate, the City also assumed the payment of an annual return and an annual depreciation allowance based on the value of property of the Company within the city measured by reproduction cost. The total annual charges assumed by the City by the terms of the contract exclusive of the cost of water approached $400,000. In our view, however, the inclusion of the value of the distribution system in the rate base did not result in a double return on this property. It seems reasonable that if it was the intention of the parties that these payments were to be taken into consideration as affecting the allowable return to the Company in the rate case, the contract would have said so. The only reference in the contract to proceedings before the Commission is the following: "It is hereby understood and agreed that neither the purpose nor the intent nor the obligation of this agreement, when approved or accepted by the Pennsylvania Public Utility Commission, is such as to impair or in anywise affect the exercise by said Commission of any of the powers vested in it by the Public Utility Law." The Commission in commenting on these charges regarded them merely as a part of "a formula for determining a reasonable charge for the service" and concluded that "all of the utility's plant used and useful in the public service must be included in [the] rate base to determine the justness of revenues to be received from all customers." The total amount of the payments made by the City under the contract was included in the estimated total revenues of the Company which induced the Commission to allow a return of 5.81% on a base of $21,000,000. There was no duplication in the payment of any part of the fair return on its total property to which the Company was entitled.

The scope of our review in this appeal is well settled. Where as here, no constitutional rights are violated, we may not vacate or set aside the order of the Commission either in whole or in part except for error of law or lack of substantial evidence to support the Commission's findings. Section 1107 of the Public Utility Law, the Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1437. And we may not substitute our judgment or discretion for that of the Commission when acting within its administrative power. *Pittsburgh v. Pa. P. U. C.*, 168 Pa. Superior Ct. 95, supra. Appellant's criticism of the reproduction cost figures accepted by the Commission cannot be considered by us in this appeal. There was substantial evidence of reproduction cost based upon pricing methods used by the company's expert. The validity of the method used and the weight of the testimony on this phase of the case were for the Commission and not for us.

In its reproduction cost study the Company included an estimate of overheads to cover contingencies; engineering, administrative expense both general and legal, promotion and organization expense, and interest during construction. These, in total, amounted to 18.9% of the direct cost of construction. Uncontradicted testimony in support of these overheads was presented by the Company's engineer Mr. Jacobs. The Commission criticized some of the claims for overheads and adopted judgment figures which reduced the amounts as claimed to approximately 14.5% of direct costs of construction. Reproduction value should include a reasonable allowance for overhead charges that necessarily would be incurred in reproducing the utility. But proof of actual expenditures for overheads originally made are not essential. *Solar Electric Co. v. P. U. C.*, 137 Pa. Superior Ct. 325, 356, 9 A. 2d 447. The weight of the testimony on this phase of the case also was for the Commission.

So also there is no merit in the appellant's criticism of the allowance of working capital for materials and supplies. The claim for cash working capital was wholly disallowed and $206,000 claimed for materials and supplies was allowed only to the extent of $150,-000. The same principles which called for a denial of an allowance for cash working capital (Cf. *Pittsburgh v. Pennsylvania P. U. C.*, 370 Pa. 305, 309-312, 88 A. 2d 59) did not necessarily prohibit a capital allowance for materials and supplies. The allowance in this case was a judgment figure which we may not disturb under the circumstances of this case.

In spite of our pronouncement in *Pittsburgh v. Pa. P. U. C.*, 169 Pa. Superior Ct. 400, 405, 82 A. 2d 515, that "It is solely for the Commission what formula it shall use in determining fair average prices", we are asked to say that there is error in the failure of the Commission to require reproduction cost estimates based on 10-year average prices. The Commission could not have rejected evidence of 10-year average prices if offered and if received the Commission would have been bound to consider such evidence for what it was worth. *City of Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607. In the *Bell Telephone Company Case*, supra (169 Pa. Superior Ct. 400) we sustained the Commission in using 26-month average prices; here estimates were based on average prices over a five-year period. There is no obligation on us to further dilute inflationary present day values by requiring that they be averaged down with reproduction costs expressed in the dollars of a past decade.

The weight to be given evidence of reproduction costs was for the Commission. Moreover the Commission did not err in basing its finding of original cost on a determination of $13,442,682 made by it in a prior rate proceeding in 1949 to which the City was a party.

*Pittsburgh v. South Pittsburgh Water Company,* 27 Pa. P. U. C. 613. To this amount the Company added $3,543,537 representing the total cost of new additions to December 31, 1951 resulting in an original cost finding in this case of $16,988,219. The City did not appeal from the 1949 determination and did not offer any testimony in the present case to refute the Company's evidence of original cost.

Finally, we are unable to find merit in the City's contention that the allowed rate of return of 5.81% is excessive. The City would limit the return to the bare-bones cost of capital. There is no difference between the City and the Commission as to composite cost of capital at 5.38% as found by the Commission. But the Commission in allowing a higher rate said: "This record does not indicate a recent trend toward a higher overall cost of capital. We recognize, however, that current market capital costs are fluctuating constantly, and in fixing a fair rate of return some consideration must be given to normal risks and uncertainties associated with financing in the capital markets." Rate of return is not entirely synonymous with the cost of capital as contended for by the City's witnesses. In *Pa. P. & L. Co. v. P. S. C.,* 128 Pa. Superior Ct. 195, 212, 193 A. 427, we quoted with approval the following from *Bluefield Water Works & I. Co. v. P. S. C.,* 262 U. S. 679, 692: " 'What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts.' " We reaffirmed the principle in *Phila. Trans. Co. v. Pa. P. U. C.,* 155 Pa. Superior Ct. 9, 27, 29, 37 A. 2d 138, and *Solar Electric Co. v. Pa. P. U. C.,* supra, p. 388, and as recently as *City of Pittsburgh v. Pa. P. U. C.,* 171 Pa. Superior Ct. 187, 207, 90 A. 2d 607. "The rate of return is necessarily a vari-

able depending on many factors; it should be adequate and may not be confiscatory": *Schuylkill Val. Lines, Inc. v. P. U. C. et al.,* 165 Pa. Superior Ct. 393, 403, 68 A. 2d 448. The business of water companies is comparatively stable; earnings in the present usually are reliable forecasts of earnings for the future. The allowed return of 5.81 is somewhat above the present bare cost of capital but it cannot be said that the Commission in refusing to apply "the strict cost of money formula" in this case failed to exercise "a fair and enlightened judgment having regard for all relevant facts."

Order affirmed.